## Pittsburg, Johnstown, Ebensburg and Eastern Railroad Company *v.* Altoona and Beech Creek Railroad Company.

*Corporations—Ultra vires—Railroads—Lease.*

A court of equity will not declare a railroad lease null and void as between the parties to it on the ground of ultra vires, after the lease has been executed, and the lessor has enjoyed some of the benefits of it.

*Railroads—Lease—Distress.*

A railroad company which has leased its railroad to another railroad company, cannot collect the rental by distress.

*Railroads—Lease—Rental—Failure to perform covenants—Forfeiture.*

Where a railroad lease contains a covenant to pay rental and also a covenant by the lessee to build certain connections without naming the time within which they are to be built, and the lessee fails to pay the rent or to build the connections, the court instead of declaring an immediate forfeiture will fix a reasonable time within which rent must be paid and the connections built, or the property surrendered to the lessor.

Argued April 19, 1900.   Appeal, No. 130, Jan. T., 1900, by plaintiffs and defendants from decree of C. P. Blair Co., No. 329, Equity Docket B, on bill in equity in case of Pittsburg, Johnstown, Ebensburg and Eastern Railroad Company and the Altoona and Beech Creek Terminal Railroad Company.v. Altoona and Beech Creek Railrood Company, Lessors and Henry Snyder, Constable.   Before GREEN, C. J., MITCHELL, DEAN, BROWN and MESTREZAT, JJ.   Decree modified.

Bill in equity for a decree of forfeiture of a lease.

The facts appear by the opinion of LOVE, P. J., which was as follows:

This is a bill in equity filed by the plaintiffs, alleging that they were duly incorporated and organized and existing as such companies under the laws of the commonwealth of Pennsylvania, and also that the defendant railroad company is duly incorporated and organized and existing under the laws of Pennsylvania.

That Samuel P. Langdon is the president of the Pittsburg, Johnstown, Ebensburg and Eastern Railroad Company.   These

allegations in the bill are admitted. The bill further alleges that the principal stockholders of the Altoona and Beech Creek Railroad Company and owners thereof are Andrew Kipple, W. L. Shellenberger, S. J. Wesley, W. S. Lee, W. J. Heinsling, Geo. S. Adams and the estates of William and John Loudon. That these said parties just named, January 5, 1893, entered into an article of agreement with Samuel P. Langdon, agreeing to transfer and deliver to him sixty per cent of the capital stock of the Altoona, Clearfield and Northern Railroad Company and that said parties being unable to comply with their agreement Samuel P. Langdon had brought suit against them to recover damages therefor, claiming the sum of $200,000. The bill further alleges that the defendants in said suit frequently sought him to make a compromise of said suit, and to lease to him the Altoona and Beech Creek Railroad, and as an inducement to said Samuel P. Langdon, proposed to lease to him said railroad upon favorable terms, provided that the litigation pending against said parties, or said suit be dropped and marked settled of record, and also that he, the said Langdon, would pay certain pay rolls and outstanding bills of said railroad company and charge them against the rent he covenanted to pay. That to this said Langdon agreed that a lease was executed December 8, 1897, between the said Altoona and Beech Creek Railroad Company and Samuel P. Langdon, and practically the Pittsburg, Johnstown, Ebensburg and Eastern Railroad Company, and the Altoona and Beech Creek Terminal Railroad Company, to be chartered and organized. That on December 8, 1899, under the lease there would have been due for rent the sum of $1,200, but that it had been overpaid by the lessees, by the payment of pay rolls and outstanding bills of the lessor. The bill further sets forth, that the lessor issued a landlord's warrant, and levied upon a lot of ties, rails, etc., to collect the rent alleged to be due, on or about December 19, 1899; also that by virtue of a clause in the lease, that the lessor on or about December 12, 1899, served a notice upon the lessees terminating the lease, and then by the prayers in the bill asks that the lessor be restrained from collecting the rent by distress, and also to be enjoined and restrained from terminating the lease.

To this bill the Altoona and Beech Creek Railroad Company demurred, and also filed an answer, and also filed a cross-bill,

which in substance sets forth the same facts alleged in the answer and prays for affirmative relief. The plaintiffs in the original bill also filed an answer to the cross-bill.

The answer to the original bill denies the allegations contained in the bill that the defendants to the suit brought by S. P. Langdon sought him to secure a compromise of the same, and that they as the principal stockholders and owners of the Altoona and Beech Creek Railroad Company, sought to lease him their road, on favorable terms in order to effect a settlement of said suit. It also denies the allegations that the pay rolls and outstanding bills of their company were to be paid by S. P. Langdon and deducted from the rent provided for in the lease, and alleges that said bills to the amount of about $800 were agreed to be paid by Langdon in addition to the rent reserved in the lease. In the cross-bill the plaintiffs therein allege that, at or about the time the lease was being negotiated and executed, S. P. Langdon represented that he had made arrangements financially to construct the Pittsburg, Johnstown, Ebensburg and Eastern Railroad from Johnstown to Ramey, and also to proceed to construct the Altoona and Beech Creek Terminal Railroad, from Juniata, the terminus of the Altoona and Beech Creek Railroad to Altoona, and to make the connections provided for in the lease, and that the work would be commenced in a few weeks from the date of the execution of the lease, and that he expected to have them completed during the year of 1898. And that he has failed to keep or perform the covenants in the lease in that particular, and that he was not then and has not been and is still unable to perform his covenants as provided in said lease, and prays that the lease be declared null and void and that the property be decreed to be turned over to the lessor. The answer filed to the cross-bill denies these allegations. The foregoing are in substance the principal allegations of fact, and denials thereof contained in the bills involved in this controversy.

### CONCLUSIONS OF FACT.

The Pittsburg, Johnstown, Ebensburg and Eastern Railroad Company, and the Altoona and Beech Creek Terminal Railroad Company are both duly chartered under the laws of the commonwealth of Pennsylvania. It is so admitted. The former

company of which Samuel P. Langdon is president, contemplated and still contemplates the construction of a railroad from Johnstown via Ebensburg to a point in Clearfield county near Ramey, the present terminus of the Altoona and Philipsburg Connecting Railroad. The Altoona and Beech Creek Railroad Company is duly chartered under the laws of the commonwealth, and has constructed and has in operation a railroad from Juniata borough in Blair county, to a point named Dougherty in Cambria county. The line of the road as constructed and operated is about fifteen miles in length. The Altoona and Philipsburg Connecting Railroad Company has a road constructed and in operation, from Philipsburg, Centre county, to Ramey in Clearfield county, a distance of about thirteen miles. The distance from Ramey, the present western terminus of the Altoona and Philipsburg Connecting Railroad to Dougherty, the present northwestern terminus of the Altoona and Beech Creek Railroad is about seventeen miles. [Between Dougherty and Ramey there has not been any railroad constructed, and there is none in process of construction. The contemplated route of the Altoona, Beech Creek and Terminal Railroad is from the present terminus of the Altoona and Beech Creek Railroad at Juniata borough to Altoona, a distance of about two miles. Said road has not been constructed and is not yet in process of construction. There has been nothing done toward the construction of the Pittsburg, Johnstown, Ebensburg and Eastern Railroad from Johnstown to Ramey, except a survey of a route. Whether said survey has been properly adopted does not appear.] [12] This was and is the status of the railroads and railroad companies who became parties to the lease, which gives rise to the controversy in this case, at the time of its execution. The Altoona and Beech Creek Railroad Company executed its lease December 8, 1897, to Samuel P. Langdon and his assigns, the Pittsburg, Johnstown, Ebensburg and Eastern Railroad Company and the Altoona and Beech Creek Terminal Railroad Company, not yet chartered, of which the following is a copy:

" This agreement made this eighth day of December, A. D., 1897, between the Altoona and Beech Creek Railroad Company of the first part, and Samuel P. Langdon of the city and county of Philadelphia, state of Pennsylvania, party of second part.

" Whereas, the party of the second part is interested as a promoter and otherwise in a certain railroad company, recently incorporated in the state of Pennsylvania, known as the Pittsburg, Johnstown, Ebensburg and Eastern Railroad Company, which has, among other things, for its object and purpose the building and completion of a railroad from Ramey, Pennsylvania, the present terminus of the Altoona and Philipsburg Connecting Railroad to the Baltimore and Ohio Railroad at Johnstown, Pennsylvania, which it is to the interest of the party of the first part to have built, and the said party of the first part is desirous of aiding the said party of the second part to secure the completion of said road from Ramey, Pennsylvania, to Johnstown, Pennsylvania, as aforesaid, thereby making a new through line from Pittsburg, Philadelphia and New York to Altoona.

" And, whereas the party of the second part has secured the Altoona and Philipsburg Connecting Railroad by agreement under date of October 20, 1897, and the same assigned to Pittsburg, Johnstown, Ebensburg and Eastern Railroad under date of November 5, 1897.

" Now therefore for the consideration of the sum of $1.00, lawful money of the United States of America, and other valuable considerations paid to the said party of the first part by the party of the second part the receipt of which is hereby acknowledged ; and the further consideration of the promotion by the said party of the second part of the railroad aforesaid the parties hereto have agreed as follows :

" First. The party of the first part hereby leases its railroad franchises, real estate, rolling stock, equipment and personal property of said company to the party of the second part or his assigns, the Pittsburg, Johnstown, Ebensburg and Eastern Railroad Company, its successors or assigns, and the Altoona and Beech Creek Terminal Railroad Company, a corporation to be hereafter organized under and by virtue of the laws of Pennsylvania for the term of nine hundred and ninety (990) years from the date hereof, at an annual rental of six hundred ($600) dollars, together with the state tax on the capital stock of the party of the first part, payable quarterly or every three months from the date hereof: and in addition to the said rental of six hundred dollars, the said party of the second part,

his executors, administrators and assigns, hereby agree upon the completion and operating of said proposed railroad, to pay and yield annually unto the party of the first part, its successors and assigns, one per centum of the gross earnings of the said railroad extending from Ramey to Altoona. And the party of the first part also agrees to accord to the party of the second part its mutual co-operation in the extension of its line to connect it with the said projected railroad, and also the contemplated extension into the city of Altoona.

"Third. In consideration of the premises, the said party of the second part hereby agrees to promote, to the best of his ability, the building and completion of the line of railroad from Ramey to Johnstown and into the city of Altoona aforesaid.

"Fourth. Upon the failure of the party of the second part, or his assigns, to comply with any and all of the terms and conditions of this lease, then and in that event this lease to fully cease and terminate upon thirty days' notice in writing to the party of the second part, or his executors, administrators and assigns, who hereby agree to surrender peaceable possession of all the rights, privileges, property and franchises contained herein."

The second paragraph in this lease, omitted above, contained provisions relative to a sale of the railroad projects in contemplation and is not material in this controversy.

The Altoona and Beech Creek Railroad Company, lessors, on or about December 12, 1899, served a notice in writing upon Samuel P. Langdon, and the Pittsburg, Johnstown, Ebensburg and Eastern Railroad Company, and the Altoona and Beech Creek Terminal Railroad Company, assignees of said lease forfeiting and terminating said lease under the provisions of the fourth paragraph thereof. The defendant company (lessor) claimed the right to forfeit the lease because of nonpayment of rent. Whether or not there was rent due and unpaid was one of the disputed facts in the case. [We think the weight of the evidence establishes the fact, that Samuel P. Langdon assumed and agreed to pay as part consideration of said lease; in addition to the rent reserved, outstanding bills of the Altoona and Beech Creek Railroad Company to the amount of $800, and while the evidence shows that Samuel P. Langdon or the Pittsburg, Johnstown, Ebensburg and Eastern Railroad

Company paid about $1,200 of outstanding bills of the defendant company, yet it would leave rent due and unpaid December 8, 1899, under the lease the sum of about $800.] [13]

[The weight of the evidence shows that at the time of the execution of the lease, that Samuel P. Langdon represented that he had arrangements made to proceed with the construction of the Pittsburg, Johnstown, Ebensburg and Eastern Railroad from Ramey to Johnstown and make the connections contemplated and provided for in the agreement of lease, and that while there is no time fixed in the agreement within which said roads were to be constructed, yet Samuel P. Langdon represented that they would be constructed during the summer and winter of 1898. But as yet they have not been constructed and there was no evidence of any immediate prospects of their construction.] [14]

June 25, 1898, the Altoona and Beech Creek Railroad Company, at the suggestion of Samuel P. Langdon, president of the Pittsburg, Johnstown, Ebensburg and Eastern Railroad Company, authorized the mortgaging of their road for $150,000, and an increase of capital stock of $50,000, to aid the lessees in building an extension of their road to a point to connect with the Pittsburg, Johnstown, Ebensburg and Eastern Railroad providing bonds be issued to Langdon pro rata for every two miles of extension constructed. Langdon wanted $100,000 of the bonds as soon as the construction was put under contract. Because the Altoona and Beech Creek Railroad Company would only issue bonds pro rata as work progressed, Langdon declined or did not accept the proposition of aid so made, and nothing was done.

[Samuel P. Langdon testified that he had been doing all he could and still was using his best endeavors to arrange to have the roads mentioned in the lease constructed, but failed to give any data as to the efforts he was making in that behalf. He testified he had spent some $3,000 or $4,000 for surveys of the Pittsburg, Johnstown, Ebensburg and Eastern Railroad, that he had spent about the same amount in traveling back and forth from Philadelphia to New York and had spent about $5,000 in organizing the Altoona, Beech Creek and Terminal Railroad Company, and had spent for some grading done thereon in October, 1899, $485. These statements of expenditures were made

simply in the lump. He stated he had vouchers showing expenditures, and at the adjournment said he would produce them at final hearing; this he did not do, and as the burden was on the plaintiffs to legally show moneys expended, the evidence falls short of establishing the amounts claimed to have been expended. The same was the case as to the evidence that the running expenses and repairs to the Altoona and Beech Creek Railroad exceeded the gross receipts by about $1,500.] [15]

About December 18, 1899, the defendant company, lessor, issued a landlord's warrant and distrainer for the rent alleged to be in arrear and unpaid, and levied upon some railroad ties and rails of the Pittsburg, Johnstown, Ebensburg and Eastern Railroad Company, at or near Juniata borough which had been placed there with a view of being used in the construction of the Altoona, Beech Creek and Terminal Railroad.

[The plaintiffs in the bill alleged that a part of the consideration for the lease was the settlement of a suit pending in the court of common pleas of Blair county, of Samuel P. Langdon v. W. L. Shellenberger et al., who were the principal stockholders of the Altoona and Beech Creek Railroad Company. The suit was brought against them as individuals and not against the company or against them as stockholders thereof. The plaintiffs offered no evidence in chief in support of said allegations, and the weight of the evidence shows that the settlement of said suit had nothing to do with the consideration of the lease.] [16]

Under the foregoing facts, the questions that arise are as follows, viz:

1. Whether the Altoona and Beech Creek Railroad Company had the right to distrain for the rent due and in arrears and levy upon the property of the Pittsburg, Johnstown, Ebensburg and Eastern Railroad Company for the purpose of collecting the same.

2. Whether the Altoona and Beech Creek Railroad Company, lessor, had the right to forfeit the lease under the provisions of the fourth paragraph thereof? And third, under the pleadings, the defendant company raises the question as to whether the lease is void, because made with other railroad companies without any connecting lines of railroad, directly or

indirectly, and is the defendant therefore entitled to affirmative relief prayed for in the cross-bill filed?

As to the question of the right of the lessor company to distrain for the rent alleged to be due, we are of the opinion that the process of distress was not available. The railroad companies, lessees, being public corporations, are not subject to such process, and the defendant company, lessor, upon the argument conceded that it had no such right, and that the warrant of distress and levy made thereon were illegal. The company was therefore liable to be enjoined from proceeding under the warrant of distress.

Had the defendant corporation, lessor, a right to terminate the lease under the provisions of the fourth paragraph thereof? If there was any failure upon the part of the lessees to perform the conditions thereof, then the right to terminate is accrued and the lessor had the right to terminate it as provided in the lease.

[We have found that there was rent due and in arrears at the time the notice of forfeiture was given, which was a failure upon the part of the lessees to comply with the provisions of the lease. And while the lease does not fix any time within which the contemplated connecting railroads should be constructed, yet the evidence shows that the understanding of the parties was that they would be constructed within a year or more from the date of the execution of the lease. And as there was no definite time fixed in the lease, the law and equity would require that part of the contract to be complied with within a reasonable time. It would be of great interest to the Altoona and Beech Creek Railroad Company to have the connections provided for in the lease made. It would enhance the value of its road; then the rental, upon the completion of the connections was, as provided in the lease, to be one per centum of the gross earnings of the road from Ramey to Altoona, in addition to the $600 per annum; then, when the understanding of the parties at the time of the execution of the lease was that the connecting roads would be built during the summer and winter of 1898, and another year has elapsed since it was understood the roads would be built, and nothing has been done, and there is no immediate prospect of anything being done practically in relation thereto; then is not the lapse of over two

years, under the conditions of the lease, a reasonable time for the promotion of the enterprises, and at least to have the probability of their speedy completion, in some sound tangible shape? We think it is, and therefore under the evidence in this case so hold.

It is urged by the lessees that they have used their best efforts to secure financial aid to make practical progress toward the construction of the connecting roads. Up to this time, however, they have failed. They further urge as against the forfeiture of the lease, that they have expended moneys in making surveys of the contemplated route of the Pittsburg, Johnstown, Ebensburg and Eastern Railroad, and in traveling to New York from Philadelphia and back, and in organizing the Altoona and Beech Creek Terminal, assume that the lessees did expend money in surveying the route from Ramey to Johnstown, for the Pittsburg, Johnstown, Ebensburg and Eastern Railroad Company. It was done in the interest of that company, and was not, on account of the lease having been made, and the lessor company is not a stockholder in the Pittsburg, Johnstown, Ebensburg and Eastern Railroad Company. The same may be said as to the traveling expenses to secure funds for the construction of the Pittsburg, Johnstown, Ebensburg and Eastern Railroad. The same may be also said as to the money alleged to have been expended in the organization of the Altoona and Beech Creek Terminal Railroad Company, one of the lessees. So that there does not appear from the evidence, any expenditure of money on the part of the lessees except such as was to promote the advancement of the roads they, if constructed, would own and control, and in which the lessor company had no direct interest, that would raise an equity against the termination of the lease, and surely any moneys expended to advance their own personal corporate interests could raise none.

On the other hand would it be equitable to have the property and franchises of the lessor, under the facts as found, tied up at a mere nominal rent for a period of 990 years, or for an indefinite period, without the prospect of the contemplated connecting roads being constructed, and the principal consideration and rental, to wit: (one per centum of the gross earnings provided for in the lease) to fail?

We think not. We are, therefore, for this reason, also of the

opinion that the lessor company had a right to terminate the lease.] [17]

It is urged on part of the defendant company that the lease is void because ultra vires and against public policy, on the ground that at the time of the execution of the lease, the Altoona and Beech Creek Railroad did not connect with any road owned or controlled by the lessee or his assigns, and does not now connect with any, either directly or indirectly.

It is very fully supported by authority that corporations established for purposes quasi public, such as railroads, canals, etc., to which the right of eminent domain and other extraordinary privileges are granted in order to enable them to accommodate the public, may not, without distinct legislative authority, make any alienation, absolute or conditional, either of the general franchise to be a corporation, or of the subordinate franchise to manage and carry on its corporate business, without which, its function to be a corporation can have little more than a nominal existence. They cannot thus devolve upon others, duties, privileges and powers which were conferred upon them for the public advantage; and all contracts and transactions by which this is attempted are ultra vires and void. See 27 Am. & Eng. Ency. of Law (1st ed.), p. 384, and cases cited.

Pierce on Railroads, page 514, states the general principle as follows: "Corporations having by reason of their objects, or the extraordinary powers conferred upon them, certain public obligations, are not permitted to enter into contracts which disable them from performing their public functions. Thus a railroad corporation cannot as already seen, without legislative authority, transfer by deed, mortgage, lease, or other agreement, its railroad and franchises, or assume the ownership or management of some other like enterprise. Such a transfer may have the effect to substitute a scheme different from that for which authority was obtained, to put the management into the hands of persons other than those intended, and to combine enterprises which the legislature presumably thought it prudent to keep separate. Such arrangements are generally held void as against public policy, and involving a breach of public duty. They are also treated as ultra vires; but they should not be confounded under that term with ordinary business transactions

which may not be necessary or incidental to the express powers of a corporation."

The same principles are laid down as the general rules of law, in Angell and Ames on Corporations, section 191 and notes, and Redfield on Railways (5th ed.), c. 22, 644.

It is true that under the Act of April 23, 1861, P. L. 410, and the Act of February 17, 1870, P. L. 31, railroad companies are authorized to purchase stock in other railroads, and, by the act of 1870, are authorized to lease or become lessees of other railroads, but provides: " That such road or roads so embraced in any such lease, assignment, contract or guarantee, shall be connected, either directly or by means of intervening line, with the railroad or railroads of said company or companies of this commonwealth so entering into such lease, assignment, contract or guarantee, and thus forming a continuous route or routes for the transportation of persons and property."

Thus it will be readily seen, that by virtue of legislative authority, the power to lease and the power to become lessees, must be of railroads that connect directly or by intervening roads so as to form a continuous route for the transportation of persons and property.

It is unnecessary to discuss the power conferred under said acts of assembly as they have been fully construed by the Supreme Court in the case of Pittsburg & Connellsville R. R. Co. v. Bedford & Bridgeport R. R. Co. et al., 81* Pa. 104. That case as well as the case of Van Steuben v. Central R. R. Co., 178 Pa. 368, hold that a railroad lease made without clear and specific authority is against public policy and utterly void, and fully recognize and affirm the general rule above laid down by the authorities cited.

[So, it being unquestioned that the parties to this lease have no connecting line of road, directly or by intervening lines and have no continuous route for the transportation of persons or property, the lease is, therefore, under the great weight of authority, void as against public policy.] [18]

Is the defendant company entitled to affirmative relief? It filed a cross-bill, and asks that the lease be declared void and that the property be restored to it.

[The plaintiff urges that if the contract is ultra vires yet the lessor being a party to it cannot ask for affirmative relief.

That the courts will not lend their aid to parties to a contract in which they are both equally guilty, if exceeding their authority in the making of it. While this proposition may be true in many instances, yet where the contract is not that of an ordinary business transaction, but is one that is not only beyond the power of the contracting parties to make, but is against public policy, and involves the shifting of duties and obligations, due the public and imposed by the grant of the charter upon a corporation, to others, we think the courts have the power to annul the contract and regulate the parties to the status occupied before entering into the contract. If public policy says you cannot make such a contract, because you cannot shift the duties, responsibilities and obligations placed upon you by the grant,—then public policy can, with equal force, say that you again assume the duties and obligations imposed by your charter to the public.

And as we have found that there have been no such equities shown by the plaintiffs in the bill as would stay the hand of a court of equity, in placing the parties to the lease in the same status respecting their several properties as they were before its execution, we think the defendant may be entitled to affirmative relief.] [19]

In accordance with the foregoing we make the following decree:

This cause came on to be heard at this term and was argued by counsel, and thereupon, upon consideration thereof, it is ordered, adjudged and decree as follows, viz :

[That the Altoona and Beech Creek Railroad Company and Henry Snyder, the defendants, be and are hereby, perpetually enjoined and restrained from any proceeding upon said process of distress to collect rent alleged to be due, and the property levied upon is hereby released from said levy and distress, this without prejudice to the right of said lessor to lawfully sue and recover any rent due, if such right exists under the lease.

It is further ordered, adjudged and decreed, that the lease in question be and is hereby declared null and void, and that the Pittsburg, Johnstown, Ebensburg and Eastern Railroad Company and the Altoona, Beech Creek and Terminal Railroad, lessees, surrender possession of the railroad property and franchises leased and mentioned in said lease, to the Altoona and

Beech Creek Railroad Company, lessor, within twenty days from the filing of this decree.

. It is further ordered, adjudged and decreed, that each of the parties to this suit pay one half the costs thereof, that is the plaintiffs pay one half and the defendants pay one half.] [20]

*Errors assigned* among others were (12–20) portions of opinion as above, quoting them.

*Thomas H. Greevy*, for appellants.—Under the circumstances as presented in this case, a court of equity ought not to decree a forfeiture of the lease : Livingston v. Stickles, 7 Hill (N. Y.), 253 ; Estabrook v. Hughes, 8 Neb. 496.; Wick v. Bredin, 189 Pa. 83 ; Thompson v. Christie, 138 Pa. 249 ; Steiner v. Marks, 172 Pa. 404.

In the application of the law under the plea of ultra vires in this case, the court gives the plea the same force and effect as it would were the state interposing its power to forfeit the charter. This is error. The application of the law is entirely different when corporations interpose this defense between themselves, to avoid liability, or rescind contracts which they have deliberately entered into : Camden & Atlantic R. R. Co. v. May's Landing, etc., R. R. Co., 48 N. J. Law, 567 ; Hawkes v. Eastern Counties R. R. Co., 1 De G. M. & G. 760 ; Whitney Arms Co. v. Barlow, 63 N. Y. 62 ; Steam Nav. Co. v. Weed, 17 Barb. (N. Y.) 378 ; Cary v. Cleveland, etc., R. R. Co., 29 Barb. (N. Y.) 36.

Executed contracts will not be disturbed under plea of ultra vires : Monument Nat. Bank v. Globe Works, 101 Mass. 58 ; Parish v. Wheeler, 22 N. Y. 509 ; Thomas v. West Jersey R. R. Co., 101 U. S. 71 ; Bradley v. Ballard, 55 Ill. 413 ; Black v. Del. & Raritan Canal Co., 9 C. E. Green (N. J.), 456 ; McElroy v. Minnesota Percheron Horse Co., 71 N. W. Repr. (Wis.) 652 ; Wright v. Pipe Line Co., 101 Pa. 206 ; Lestapies v. Ingraham, 5 Pa. 81 ; Boyd v. American Carbon Black Co., 182 Pa. 210 ; Camden & Atlantic R. R. Co. v. May's Landing. & Egg Harbor City R. R. Co., 48 N. J. Law, 530 ; Trenton Mutual Life & Fire Ins. Co. v. McKelway, 1 Beas. 133.

*William S. Hammond*, for appellees.—The lease was properly

forfeited: Munroe v. Armstrong, 96 Pa. 309; Brown v. Vandergrift, 80 Pa. 142; Pittsburg & Connellsville R. R. Co. v. Bedford & Bridgeport R. R. Co., 81* Pa. 104; Grantz v. Penna. R. Co., 41 Pa. 147; Phila. & Erie R. R. Co. v. Catawissa R. R. Co., 53 Pa. 20.

Railway leases are void unless authorized by express law: 5 Thompson's Commentaries on the Law of Corporations, secs. 5, 880; Van Steuben v. Central R. R. Co., 178 Pa. 367; Hampe v. Pittsburg, etc., Traction Co., 165 Pa. 468; 4 Thompson's Commentaries on the Law of Corporations, secs. 5, 355; Thomas v. West Jersey R. R. Co., 101 U. S. 71; Oregon Ry. & Nav. Co. v. Oregonian Ry. Co., 130 U. S. 1; Manchester & Lawrence R. R. Co. v. Concord R. R. Co., 47 Am. & Eng. R. R. Cases, 360.

OPINION BY MR. JUSTICE BROWN, May 29, 1900:

The Altoona and Beech Creek Railroad Company, on its cross-bill filed, was entitled to affirmative relief, but not of the summary character granted by the court below. By the decree made, the lease between the appellee and the Pittsburg, Johnstown, Ebensburg and Eastern Railroad Company and the Altoona, Beech Creek and Terminal Railroad Company was declared to be null and void, on the ground that its execution had been ultra vires as to the parties to it. The learned judge was led to this conclusion under what he regarded as " the great weight of authority, " citing, in support of the view he expressed, Pittsburg and Connellsville R. R. Co. v. Bedford and Bridgeport R. R. Co. et al., 81* Pa. 104, and Van Steuben v. The Central R. R. Co., 178 Pa. 367. In the former case, Mr. Justice SHARSWOOD, delivering the opinion of the court, said: " The principal question which has been raised and discussed upon this motion to dissolve the preliminary injunction heretofore granted is, whether the Bedford and Bridgeport Railroad Company have any right to execute a lease to the Pittsburg and Connellsville Railroad Company, as proposed by the resolution offered in the board of directors at their meeting of October 13, 1870. If it shall appear that no such right exists, then it will be altogether unnecessary to consider and determine two other questions which have been the subject of much earnest contention before us." The question there was, not whether a

contract already executed, as the one before us, should be declared null and void and set aside as being ultra vires, but whether one, manifestly so, should, in the face of a complaining stockholder, coming into court before its execution and asking for equitable relief, be executed by the officers of the corporation. In the second case, the Central Railroad Company of New Jersey sought to evade responsibility for its negligence by shifting it upon an alleged lessee; but, as no valid lease had been made—as the company had executed no valid agreement under which it could cast upon another the duty of carefully and properly operating the road—it, and it alone, was held to be liable. This is all that was decided by our Brother McCollum. There is a marked distinction between these cases, relied upon by the learned judge below, and the one we are now considering.

In the present case, the cry of ultra vires is made by a party to the contract—to the executed agreement from which it has already derived some benefit. If it is ultra vires now, it was ultra vires then, when the contract was solemnly entered into by this appellee, with the full knowledge that there was no connecting line, and equity will turn a deaf ear for relief from a compact intelligently and deliberately made when prayed for by a party to it, whose conscience has become quickened only when hopes are disappointed and expectations not realized. If we are asked to give equitable relief to extended hands, they must not only be clean, but unfettered by a contract of their own making. No one injured by this alleged illegal lease is here complaining, and the commonwealth that gave life and being to its creatures, retaining the right to at all times supervise their conduct, is not challenging the proper use of the powers and privileges conferred. Conscience, which is the source of equity, says to this appellee that its prayer for relief cannot be granted, and, if authority should be asked for, it will be found in the following and the many other utterances of our own court to which we could turn. " The law never sustains a defense of this nature out of regard for a defendant; it does so only where an imperative rule of public policy requires it. The instances are rare in which a corporation or individual has been permitted to set up its own wrong in order to retain both the property and its price. . . .   It would be difficult to imagine

a defense with less merit, and the law would be exceedingly impotent, were it to allow it to succeed: " Wright v. Pipe Line Co., 101 Pa. 206. To the foregoing we may add Oil Creek and Allegheny River Railroad Co. v. The Pennsylvania Transportation Company, 83 Pa. 160, in which Chief Justice PAXSON says: " It does not appear to have occurred to the defendants below that the contract of July 26, 1871, was ultra vires until it became apparent that, by their subsequent modification of it, they had made a bad bargain. They then attempted to repudiate the modification and fall back upon the original agreement of July 26. Yet, the illegality, if any existed, was to be found in the original contract; assuming that to be legal, the modification of it was equally so. We do not think the defendants are in a position to defend upon the ground of the illegality of the contract."

Though we cannot agree with the learned judge below that the lease was null and void, as between the parties to it, we do not differ with him as to the dereliction of the lessee, Langdon, and his assigns, in the discharge of the obligations assumed; but, as the penalty imposed was forfeiture, we feel that, under all the facts developed and most carefully reviewed, we ought to mitigate it. That portion of the decree of the court below enjoining the collection of the rent alleged to be due, by process of distress, is affirmed; and it is ordered, adjudged and decreed that, if on or before July 1, 1900, the appellants pay the rental due to the appellee, as found by the court below, to wit: $800 due December 8, 1899, and all subsequently accruing rent, and that on or before January 1, 1901, appellants construct the railroad and make the connections contemplated and provided for in the agreement of lease, the bill of complaint and the cross-bill be dismissed; and, upon failure to so pay the said rent, or to so construct the said railroad and make the said connections, that thereupon the appellants shall forthwith surrender possession of the railroad property and franchises leased and mentioned in said lease, unto the appellee, one half of the costs of the proceedings in the court below and on this appeal to be borne and paid by the appellants and the other half by the appellee.